United States District Court
Eastern District of Michigan
Southern Division

United States of America,

                  Plaintiff,

v.

City National Bank Cashier's Check
#111709 (formerly cashier's check
#259925063 in the name of/payable to Eze
Cleaning Service, Inc.) in amount of
$1,336,034.11 dated 08/29/2018 remitted
by EZE Cleaning to the U.S. Marshals
Service; City National Bank Cashier's
Check #111711 (formerly cashier's check
#2520464 in name of/payable to Gilberto
E. Vazquez) in amount of $27,348.26,
dated 08/30/2018, remitted by EZE
Cleaning-Gilberto Vazquez, payable to the
U.S. Marshals Service,

                  Defendants *in rem*.

Case No.
Hon.

**Demand for Jury Trial**

---

## Complaint for Forfeiture

---

Plaintiff, the United States, by and through Matthew Schneider, United

States Attorney for the Eastern District of Michigan, and Shankar Ramamurthy,

Assistant United States Attorney, states upon information and belief in support of this Complaint for Forfeiture as follows:

1.     This is an *in rem* civil forfeiture action pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and/or (a)(1)(C).

2.     This Court has original jurisdiction over this forfeiture action pursuant to Title 28, United States Code, Section 1345 as this action is being commenced by the United States of America as Plaintiff.

3.     This Court has jurisdiction over this forfeiture action, pursuant to Title 28, United States Code, Section 1355(b)(1)(A), as the acts giving rise to forfeiture occurred in the Eastern District of Michigan.

4.     Venue is proper before this Court pursuant to Title 28, United States Code, Section 1391(b)(2) as a substantial part of the events or omissions giving rise to the Plaintiffs claims occurred in the Eastern District of Michigan.

5.     Venue is also proper before this Court pursuant to Title 28, United States Code, Sections 1395 (a) and (b) as the action accrued and/or the Defendants *in rem* were found and seized in the Eastern District of Michigan.

## Defendants *In Rem*

6.      The Defendants *in rem* consist of the following:

  a)  City National Bank Cashier's Check #111709 (formerly cashier's check #259925063 in the name of/payable to Eze Cleaning Service, Inc.) in amount of $1,336,034.11 dated 08/29/2018 remitted by EZE Cleaning to the U.S. Marshals Service;

b) City National Bank Cashier's Check #111711 (formerly cashier's check #2520464 in name of/payable to Gilberto E. Vazquez) in amount of $27,348.26, dated 08/30/2018, remitted by EZE Cleaning-Gilberto Vazquez, payable to the U.S. Marshals Service.

7. The Defendants *in rem* described in Paragraph 6(a)-(b) shall be referred to collectively as the "Defendant Currency."

8. The Defendant Currency is, and will continue to be, in the custody of the United States Marshals Service.

## Underlying Statutory Basis For Civil Forfeiture

9. Title 18, United States Code, Section 1347(1) prohibits health care fraud: Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice-

(1) to defraud any health care benefit program; or

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

10. Title 18, United States Code, Section 1349 provides that any person who attempts or conspires to commit health care fraud or wire fraud shall be subject to the same penalties as those in 18 U.S.C. § 1347 and 18 U.S.C. § 1343, respectively.

11. Title 18, United States Code, Section 1956 prohibits engaging in

3

monetary transactions in property derived from specified unlawful activity:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –
>
> A. With the intent to promote the carrying on of a specified unlawful activity;
> B. Knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the rouse, the ownership or control of the proceeds of a specified unlawful activity.

12.     Title 18, United States Code, Section 1956 sets forth a list of "specified unlawful activities," which includes, "any act or activity constituting an offense involving a Federal health care offense."  18 U.S.C. § 1956(c)(7)(F)

13.     Title 18, United States Code, Section 1957 prohibits knowingly engaging in or attempting to engage in a monetary transaction in criminally derived property or a value greater than $10,000 and is derived from specified unlawful activity.

14.     Title 18, United States Code, Section 24(b), defines a "health care benefit program" as, among other things, "any public or private plan…affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan."

## Relevant Forfeiture Statutes

15.     Title 18, United States Code, Section 981(a)(1)(A) provides for the civil forfeiture to the United States of any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of Title 18, or any property traceable to such property.

16.     Title 18, United States Code, Section 981(a)(1)(C) provides for the civil forfeiture to the United States of the proceeds of crimes designated as "specified unlawful activities" as defined in section 1956(c)(7), or a conspiracy to commit such offense.

## Facts Supporting Forfeiture of Defendants *in rem*

### *The Medicare Program*

17.     The Medicare Program ("Medicare") is a federally-funded health care program for the aged and disabled established by Congress in 1965, as Title XVIII of the Social Security Act and codified at 42 U.S.C. § 1395.  Medicare is administered through the Centers for Medicare and Medicaid Services ("CMS").

18.     CMS is a division of the United States Department of Health and Human Services.  Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."

19.     Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

20.     Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).  Medicare Part A covers physical therapy, occupational therapy, and skilled nursing services if a facility, to include home health care, was certified by CMS as meeting certain requirements.  Part B covers the cost of physicians, services and other ancillary services not covered by Part A.  Part D, which must be combined with coverage from an insurance company or other private company approved by Medicare, covers prescription drugs.

21.     The basic requirement for any claim to be payable by Medicare is that the service must be "reasonable and necessary for the diagnosis or treatment of illness or injury" defined and based upon accepted practices in the medical community, and further defined by National Coverage Determinations issued by CMS and Local Coverage Determinations issued by the Medicare administrative contractor for the State of Michigan.

22.     Medicare allows companies that provide home health services to submit claims under Medicare Part A for partial payment prior to the completion of providing services, known as Requests for Anticipated Payments ("RAP claims"). The purpose of a RAP claim payment is to provide home health care providers with money to assist with the immediate costs associated with providing services to the Medicare beneficiary.

23.     For home health agencies, a RAP claim is submitted to the Medicare Administrative Contractor ("MAC") indicating the start of service date for a beneficiary, and the patient's condition and care needs, represented by a Health Insurance Prospective Payment System ("HIPPS") code.

24.     Home health care agencies are companies that provide medical treatment and services to individuals that are physically unable to leave their home to obtain medical treatment, and is typically provided in 60-day increments known as an episode.

25.     For the first 60-day episode of home health care, the MAC will process and pay 60 percent of the claim amount for that HIPPS code immediately. For each subsequent 60-day episode of home health care, the MAC will pay 50 percent of the claim amount for that HIPPS code.

26.     At the end of the episode, the home health care agency is expected to submit a final claim for the actual services provided.  At that time, Medicare will cancel the RAP claim and pay the final adjusted claim.  This results in the provider being paid for the net difference of the final claim paid amount and the initial RAP payment.

27.      Generally, the MAC will cancel any RAP claim for which a final claim is not received within 120 days after the start date of the episode of care, or

60 days after the paid date of the RAP, whichever is greater.  This process creates a receivable for the provider, and any future payments offset against this receivable.

### Nu-Wave Home Health Care Agency

28.     Nu-Wave was a home health care agency located in Livonia, Michigan.  The website of the Department of Licensing and Regulatory Affairs ("LARA") for the State of Michigan lists Nu-Wave as a domestic for-profit corporation with a registered address of 32540 Schoolcraft Road, Suite 230, Livonia, Michigan 48150.  The registered agent for Nu-Wave changed from Susan Dayton to Osmany Andrades Valdes ("Valdes") on or about October 14, 2016.

29.     Valdes filed documents with Medicare listing himself as having ownership interest and managing control of Nu-Wave on or about September 27, 2016, and all previous representatives were removed from the enrollment.

30.     On or about October 14, 2016, Valdes signed a CMS certificate statement known as Form CMS-855, acknowledging himself as a "5% of Greater Direct Owner" of Nu-Wave and indicating that he agreed, among other things, to abide by the Medicare laws, regulations, and program instructions, and that he understood that payment of Medicare claims is conditioned upon the claim and underlying transaction complying with such laws, regulations, and program instructions.  By signing the certification statement, Valdes also agreed that he would not knowingly present or cause to be presented a false or fraudulent claim

for payment by Medicare, and would not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

31.     Valdes was identified on the Medicare Electronic Data Interchange (EDI) enrollment form as an "administrator" at Nu-Wave on or about November 23, 2016.

32.      On or about February 9, 2017, Nu-Wave elected to receive Medicare reimbursements via electronic funds transfer (EFT) via the CMS-588 form, which was signed by Valdes, who was also listed as the Administrator and point of contact for Nu-Wave.  J.P. Morgan Chase Bank Account Number XXXXX5532 was the repository account listed for Nu-Wave on the CMS-588 form, for which Valdes was the authorized signatory.

33.     In October 2017, Nu-Wave began receiving Medicare reimbursements into J.P. Morgan Chase Bank Account Number XXXXX1892, also held in the name of Nu-Wave, with Valdes as the authorized signatory.

34.     Nu-Wave submitted approximately 30,946 initial RAP claims, for which it was reimbursed approximately $37,204,558.80 following the submission of the executed Form CMS-855, on or about October 14, 2016.

35.     No final claims were ever submitted for the initial RAP claims because the home health services described were never actually rendered.

36.     The FBI and Health and Human Services – Office of the Inspector General (HHS-OIG) investigation determined Valdes fraudulently obtained at least $37 million in Medicare funds into two accounts, held in the name of Nu-Wave, and subsequently those funds were transferred to various other bank accounts, including those from which Defendants *in rem* were seized.

***AdvanceMed Investigation***

37.     AdvanceMed is the Medicare Part A and Part B Program Safeguard Contractor in the State of Michigan.

38.     AdvanceMed conducted an initial investigation into the billing practices of Nu-Wave and determined that after a change of ownership and managing control with an effective date of September 27, 2016, Nu-Wave began submitting RAP claims for out-of-state beneficiaries.

39.     Nu-Wave submitted a significant number of RAP claims with no final claim ever submitted for home health services which were never rendered.  The result of these incomplete RAP claims was that the provider was paid approximately $37,204,558.80 for services which were never provided.

40.     AdvanceMed investigators conducted a site visit on September 27, 2017, and confirmed that Nu-Wave's location was vacant, and non-operational. Nu-Wave's payments were subsequently suspended based on a credible allegation of fraud.

41.     AdvanceMed conducted an analysis of Medicare billing and reimbursement data and determined that Nu-Wave submitted four times as many RAP claims in 2017 as in 2016, and roughly 266 times as many claims as in 2015. The annual Medicare billing summary for RAP claims from January 1, 2014 through November 15, 2017 are as follows:

| Year of Service | Beneficiary Count | Claim Count | Total Paid |
|---|---|---|---|
| 2014 | 47 | 67 | $216,824.38 |
| 2015 | 67 | 93 | $339,876.30 |
| 2016 | 873 | 6,046 | $11,029,698.17 |
| 2017 | 881 | 24,755 | $38,648,031.51 |
| **Totals:** | | **30,961** | **$50,234,430.36** |

42.     AdvanceMed determined in their investigation that Nu-Wave was not submitting any final claims for payment, but continued submitting RAP claims. They also discovered that in 2017, Nu-Wave submitted RAP claims for unique beneficiaries, 674 of whom had Florida addresses, and in some instances submitted multiple RAP claims for the same beneficiary within a short span of time.

***Sushma Bhagat***

43.     Valdes purchased Nu-Wave from Sushma Bhagat ("Bhagat"), who had listed Nu-Wave for sale on multiple websites, including Craigslist.

44.     Valdes was referred to Bhagat by a consultant. Valdes told her that he owned businesses in North Carolina and Florida, although his State of Michigan driver's license listed a residence address on Chene Street, Detroit, Michigan.

45.    Bhagat agreed to sell Nu-Wave to Valdes for $105,000.

46.    After the sale occurred, Bhagat never saw Valdes again.  She believed Valdes would contact her with questions about the business, but he did not. Bhagat attempted to contact him, but was rarely able to reach him.

47.    Bhagat learned from the property manager for Nu-Wave that Valdes had stopped paying the rent, and the property leasing agent had locked Valdes out of Nu-Wave's suite.

### Elmwood Park Plaza Apartment

48.    That Valdes had a lease at the Elmwood Park Plaza Apartments from October 2016 through October 2017, but was evicted and vacated the unit in April 2017.

### Dr. Emilio Berrios-Antuna

49.    From February 20, 2016 through September 29, 2017, Nu-Wave was reimbursed by Medicare approximately $933,713.20 for RAP claims associated with attending physician Dr. Emilio Berrios-Antuna. The billings were for beneficiaries in multiple states.

50.    In 2017, Medicare reimbursed Nu-Wave for twenty claims submitted on behalf of fifteen beneficiaries for RAP claims associated with attending physician Dr. Berrios-Antuna.

51.    Each of the claims submitted by Nu-Wave in 2017 reimbursed by Medicare were false.  Dr. Berrios-Antuna did not have any patients in other states, and had been in his current office on West Vernor Avenue in Detroit for the prior two years.

52.    Dr. Berrios-Antuna is not aware of Nu-Wave and was never the attending/referring physician for Nu-Wave patients. The billings listing him as the attending/referring physician were false.

### Dr. Abelardo Bustillo

53.    Medicare billing data showed that from February 20, 2016 through October 1, 2017, Medicare paid approximately $899,281.52 for RAP claims associated with attending/referring physician Dr. Abelardo Bustillo. The billings were for beneficiaries that were in multiple states.

54.    In 2017, Medicare reimbursed Nu-Wave for thirteen claims submitted on behalf of eleven beneficiaries for RAP claims associated with attending physician Dr. Bustillo.

55.    Dr. Bustillo retired approximately thirteen years ago from his practice located on Byron Road, Howell, Michigan.

56.    Dr. Bustillo is not aware of Nu-Wave, nor was he the attending/referring physician for any patients of Nu-Wave.  He did not have

patients in other states and the billings listing him as the attending/referring physician were false.

### Dr. Motahar Ahmed

57.     Medicare billing data showed that from February 20, 2016 through October 1, 2017, Medicare paid approximately $836,834.54 for RAP claims associated with attending/referring physician Dr. Motahar Ahmed. These billings were for beneficiaries that were in multiple states.

58.     In 2017, Medicare reimbursed Nu-Wave for twenty-three claims submitted on behalf of twenty beneficiaries for RAP claims associated with attending physician Dr. Ahmed.

59.     Dr. Ahmed is not aware of Nu-Wave, nor was he the attending/referring physician for any patients of Nu-Wave.  Dr. Ahmed did not have patients in other states and the billings listing him as the attending/referring physician were false.

### Dr. George Artzberger

60.     Medicare billing data showed that from March 20, 2016 through October 1, 2017, Medicare paid approximately $920,236.02 for RAP claims associated with attending/referring physician Dr. George Artzberger. These billings were for beneficiaries that were in multiple states.

61.     In 2017, Medicare reimbursed Nu-Wave for eighteen claims submitted on behalf of seventeen beneficiaries for RAP claims associated with attending physician Dr. Artzberger.

62.     Dr. Artzberger is not aware of Nu-Wave, nor was he the attending/referring physician for any patients of Nu-Wave.  He did not have patients in other states and the billings listing him as the attending/referring physician were false.

### Dr. Robert Ciemiega

63.     Medicare billing data showed that from February 20, 2016 through September 30, 2017, Medicare paid approximately $949,642.31 for RAP claims associated with attending/referring physician Dr. Robert Ciemiega.  These billings were for beneficiaries that were in multiple states.

64.     In 2017, Medicare reimbursed Nu-Wave for twenty-six claims submitted on behalf of twenty-three beneficiaries for RAP claims associated with attending physician Dr. Ciemiega.

65.     Dr. Ciemiega is not aware of Nu-Wave and was not the attending/referring physician for any patients of Nu-Wave. Dr. Ciemiega only has one out-of-state patient, but all billings listing him as the attending/referring physician for Nu-Wave were false.

*Site Visit*

66.    The FBI and HHS-OIG conducted a site visit of Nu-Wave on January 2, 2018 and confirmed that the provider's location was vacant and non-operational.

67.    The FBI and HHS-OIG learned in an interview with the property manager, Todd Borregard, that in May, 2017 Nu-Wave moved out of the building in the middle of the night, during the period it was receiving reimbursements from Medicare.

*Dr. Jose Castro-Ramirez*

68.    From March 20, 2016 through October 1, 2017, Medicare paid approximately $887,576.92 for RAP claims associated with attending physician Dr. Jose Castro-Ramirez ("Ramirez").  The billings were for beneficiaries in multiple states.

69.    Ramirez is currently in prison at Butner Low Federal Correctional Institution for federal crimes related to Medicare fraud.  Ramirez has been in federal custody since March 11, 2010 and is not due to be released until May 20, 2022.  A check of Medicare's exclusion list showed Ramirez has been excluded since October 20, 2011.

*The Fraud*

70.    Valdes fraudulently obtained at least $37 million in Medicare funds into two accounts held in the name of Nu-Wave.  Valdes then funneled the funds

through at least sixty bank accounts, held in the names of at least thirty-one individuals and entities.

71.    Valdes' whereabouts are presently unknown.

72.    The entities holding the accounts through which the fraudulently obtained Medicare reimbursements were transferred were front corporations that did not exist for legitimate business purposes.

73.    Defendants *in rem* constitute proceeds of health care fraud, and are funds involved in money laundering. The two Nu-Wave accounts that directly received Medicare reimbursements are denoted as Tier 1 accounts. From these accounts, funds were disbursed into the Tier 2 Nu-Wave account, and subsequently into Tier 3 accounts from which Defendants *in rem* were seized.

| Accounts Relevant to Tracing of Defendants *in rem* | | | |
|---|---|---|---|
| Financial Institution | Account Number | Account Name | Tier |
| J.P. Morgan Chase | XXXXX5532 | Nu-Wave Home Health Care, LLC | 1 |
| J.P. Morgan Chase | XXXXXX1892 | Nu-Wave Home Health Care, Inc. | 1 |
| J.P. Morgan Chase | XXXXX3768 | Nu-Wave Home Health Care, Inc. | 2 |
| J.P. Morgan Chase | XXXXXX5319 | Eze Cleaning Service, Inc. | 3 |
| J.P. Morgan Chase | XXXXX9740 | Gilberto E. Vazquez | 3 |

## **Tier 1 Accounts**

74.    **J.P. Morgan Bank Account No. XXXXX5532, held in the name of Nu-Wave Home Health Care, LLC**, was an electronic funds repository account for receipt of payment for service from Medicare as a Tier 1 bank account. This

account received at least $28,944,313.00 worth of deposits from Medicare via direct deposits from at least February, 2017 through September, 2017.

75.     J.P. Morgan Bank Account No. XXXXX5532 was opened on January 25, 2017, by Valdes, who maintained sole signatory authority over the account.

76.     The funds deposited into this account constituted proceeds of health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349.

77.     **J.P. Morgan Chase Account No. XXXXXX1892, held in the name of Nu-Wave Home Health Care, Inc.**, was an electronic funds repository as a Tier 1 bank account.  This bank account received at least $7,357,308.00 worth of electronic deposits made from Medicare during October, 2017.

78.     J.P. Morgan Chase Account No. XXXXXX1892 was established on October 27, 2016, by Valdes who maintained sole signatory authority over the bank account.

79.     The funds deposited into this account constituted proceeds of health care fraud and a conspiracy to commit health care fraud in violation of  18 U.S.C. §§ 1347 and 1349.

## Tier 2 Account

80.     **J.P. Morgan Chase Bank Account No. XXXXX3768, held in the name of Nu-Wave Home Health Care, Inc.** is a Tier 2 bank account that received

at least $35,668,571.00 from Tier 1 bank accounts J.P. Morgan Chase Account Numbers XXXXX5532 and XXXXXX1892, from at least February, 2017 through October, 2017.

81.    J.P. Morgan Chase Bank Account No. XXXXX3768 was established on October 27, 2016, by Valdes, who maintained sole signatory authority over the bank account.

82.    The funds deposited into this account constituted proceeds of health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349.

83.    The funds transferred from Tier 1 bank accounts J.P. Morgan Chase Account Numbers XXXXX5532 and XXXXXX1892 were transferred to this account in order to conceal or disguise the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and any legitimate funds in the account acted to conceal and disguise the nature, source, location, ownership, and control of the criminal proceeds, making the full amount of the funds in the account subject to seizure as "involved in" the money laundering.

84.    Between April 17, 2017 and October 23, 2017, Nu-Wave affected one hundred and twenty-six transfers of funds over $10,000 from J.P. Morgan Chase Account Numbers XXXXX5532 and XXXXXX1892 to this account. Each of these

deposits from Tier 1 accounts to this account constitutes a violation of 18 U.S.C. § 1957 in that (1) each deposit was a monetary transaction involving criminally derived funds, (2) those criminally derived funds had a value greater than $10,000, (3) the funds were derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. § 1956(c)(7)(F), and (4) the transactions occurred in the United States.

85.    During the course of 2017, there were approximately $33,743,043.00 in checks issued from J.P. Morgan Chase Account No. XXXXX3768 to Osmany Andrades Valdes and other individual targets and/or corporate business entities, including EZE Cleaning Service, Inc. and Gilberto E. Vazquez.

### *Tier 3 Accounts*

86.    **City National Bank Account No. XXXXXX5319 in the name of EZE Cleaning Service, Inc.** was a Tier 3 bank account used as an electronic funds depository for at least $1,893,571.00 in checks and deposits issued from J.P. Morgan Chase Account No. XXXXX3768 (a Tier 2 Account) from at least February, 2017 through October, 2017.

87.    City National Bank Account No. XXXXXX5319 was established by Valdes on January 25, 2017, maintaining sole signatory authority.

88.    The funds deposited into this account constitute proceeds of health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349.

89.    The funds that were transferred from Tier 2 bank account J.P. Morgan Chase Account No. XXXXX3768 to this account were transferred in order to conceal or disguise the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and any legitimate funds in the account acted to conceal and disguise the nature, source, location, ownership, and control of the criminal proceeds, making the full amount of the funds in the account subject to seizure as "involved in" the money laundering.

90.    Between February 16, 2017 through October 20, 2017, there were twenty-one transfers of funds over $10,000 from J.P. Morgan Chase Bank Account No. XXXXX3768 to this account. These deposits from the Tier 2 account to this account constitute a violation of 18 U.S.C. § 1957 in that (1) each deposit was a monetary transaction involving criminally derived funds, (2) those criminally derived funds had a value greater than $10,000, (3) the funds were derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. § 1956(c)(7)(F), and (4) the transactions occurred in the United States.

91.     On or about January 5, 2018, City National Bank closed account City National Bank Account No. XXXXXX5319 because of irregularities identified by City National Bank regulatory personnel.  At the time that this account was closed, City National Bank issued a cashier's check, described as **City National Bank Cashier's Check #259925063, in the name of EZE Cleaning Service, Inc., to EZE Cleaning Service, Inc. in an amount of $1,336,034.11**.

92.     City National Bank Cashier's Check #259925063, in the name of EZE Cleaning Service, Inc., in an amount of $1,336,034.11, identified as Defendant *in rem*, constitutes funds derived from proceeds traceable to health care fraud and a conspiracy to commit health care fraud, in violation of 18 U.S.C. §§ 1347 and 1349, and funds involved in money laundering, in violation of 18 U.S.C. §§ 1956 and 1957.

93.     **City National Bank Account No. 2504609740, in the name of Gilberto E. Vazquez** was a Tier 3 bank account used as an electronic funds depository for at least $69,178.00, in checks and deposits issued from J.P. Morgan Chase Bank Account No. XXXXX3768 (a Tier 2 account) from April, 2017 through August, 2017.

94.     City National Bank Account No. XXXXXX9740 was established by Gilberto E. Vazquez on April 3, 2017.  Vazquez maintained sole signatory authority over the bank account City National Bank Account No. XXXXXX9740.

95.     The funds deposited into this account constitute proceeds of health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349.

96.     The funds transferred from Tier 2 bank account J.P. Morgan Chase Bank Account No. XXXXX3768 to this account were transferred in order to conceal or disguise the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and that any legitimate funds in the account acted to conceal and disguise the nature, source, location, ownership, and control of the criminal proceeds, making the full amount of the funds in the account subject to seizure as "involved in" the money laundering.

97.     Between August 10, 2017 through August 22, 2017 there were two transfers of funds over $10,000 from J.P. Morgan Chase Bank Account No. XXXXX3768 to this account. Each of these deposits from the Tier 2 account to this account constitutes a violation of 18 U.S.C. § 1957 in that (1) each deposit was a monetary transaction involving criminally derived funds, (2) those criminally derived funds had a value greater than $10,000, (3) the funds were derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. § 1956(c)(7)(F), and (4) the transactions occurred in the United States.

98.     On or about January 26, 2018, City National Bank closed account City National Bank Account No. XXXXXX9740 because of irregularities identified by City National Bank regulatory personnel.  City National Bank then issued a cashier's check, described as **City National Bank Cashier's Check #2520464, in the name of Gilberto E. Vazquez, to Gilberto E. Vazquez in an amount of $27,348.26**, identified as Defendant *in rem*.

99.     City National Bank Cashier's Check #2520464, in the name of Gilberto E. Vazquez to Gilberto E. Vazquez in an amount of $27,348.26, identified as Defendant *in rem,* constitutes funds derived from proceeds traceable to health care fraud and a conspiracy to commit health care fraud, in violation of 18 U.S.C. §§ 1347 and 1349, and funds involved in money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

100.    As set forth in the paragraphs above, the Defendants *in rem* constitute property derived from, and/or traceable to proceeds and/or gross proceeds of Health Care Fraud in violation of 18 U.S.C. § 1347, Conspiracy to Commit Health Care Fraud in violation of 18 U.S.C. § 1349, and/or property involved in, or traceable to property involved in, Money Laundering in violation of 18 U.S.C. §§ 1956 and 1957.  The funds are therefore subject to seizure and civil forfeiture to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C).

## CLAIMS FOR RELIEF

101.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 100.

102.    The Defendants *in rem* are forfeitable to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(C) as proceeds and/or are property traceable to the proceeds of illegal activity, specifically Health Care Fraud, in violation of Title 18, United States Code, Section 1347 and/or Health Care Fraud Conspiracy, in violation of Title 18, United States Code, Section 1349.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully requests a trial by jury in this case.

## CONCLUSION AND RELIEF

Plaintiff respectfully requests that a warrant for arrest of the Defendants *in rem* be issued; that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed; that judgment be entered declaring the Defendants *in rem* to be condemned and forfeited to the United States for disposition according to law; and that the United States be granted such other further relief as this Court may deem just and proper together with costs and disbursements of this action.

Respectfully submitted,

Matthew Schneider
United States Attorney


s/Shankar Ramamurthy
Shankar Ramamurthy
Assistant United States Attorneys
211 W. Fort St., Ste. 2001
Detroit, MI 48226
(313) 226-9562
Shankar.Ramamurthy@usdoj.gov
(IL 6306790)

Date: February 8, 2019

## **VERIFICATION**

I, Mark Kroger, state that I am a Special Agent of the Federal Bureau of Investigation ("FBI"). I have read the foregoing Complaint for Forfeiture, and declare under penalty of perjury that the facts contained therein are true and correct to the best of my knowledge and belief, based upon knowledge possessed by me and/or on information received from other law enforcement agents.

_____

Special Agent Mark Kroger
Special Agent
Federal Bureau of Investigation

Date:  2/08/2019